Hancock, Jr., J.
(dissenting). Karen Enright is one of a class of thousands of persons who have allegedly suffered devastating abnormalities and injuries resulting from defendants’ marketing of DES. Is there any basis in the law or social policy or any principled reason in justice and fairness for holding that she — unlike other members of the class— should not be permitted to prove her case? I am convinced there is no such basis or reason. Today, however, in what appears to mark an abrupt change in the course of New York strict products liability jurisprudence, a cut-back on recent precedent and a rejection of policy established by the Legislature and accepted by our Court, the majority denies her the right to sue.
Under settled strict products doctrine (see, e.g., Codling v Paglia, 32 NY2d 330, 338-342; Prosser and Keeton, Torts § 98 [5th ed]) and Hymowitz v Lilly & Co. (73 NY2d 487, cert denied — US —, 110 S Ct 350), there can now be no question that persons in the position of Karen Enright’s mother would have a right to recover for injuries to their reproductive systems. Yet, the majority holds that Karen Enright has no right to recover, solely because she was not conceived at the time that her mother was exposed to DES in útero. But the majority gives no satisfactory reason why this fact justifies the decision to exclude her from the class of those permitted to recover for injuries caused by DES. For reasons which follow I cannot accept this result and vote to affirm the order of the Appellate Division holding that Karen Enright states a valid cause of action in strict products liability.
*390 I
Preliminarily, I note that the question of whether there can be a recovery in a products liability case for a preconception injury is before us in a dismissal motion under CPLR 3211 (a) (7). Thus, the case presents no legal hurdles with respect to foreseeability or causation. Clearly it cannot be said as a matter of law — assuming it was foreseeable that Karen’s mother’s uterus might be deformed from the DES — that it was not also foreseeable that Karen Enright would be born prematurely because of this deformity and afflicted with cerebral palsy and the other appalling consequences from which she suffers. Nor is the possibility of additional difficulties in establishing causation at trial a reason for dismissal (see, Woods v Lancet, 303 NY 349, 356; Prosser and Keeton, op. cit., § 55, at 368; Comment, Preconception Torts: Foreseeing the Unconceived, 48 U Colo L Rev 621, 625-627). The complaint alleges that plaintiff’s injuries were foreseeable and that they were caused by her mother’s exposure to DES. In deciding whether plaintiff has stated a cause of action on this motion we must assume these allegations to be true (see, Becker v Schwartz, 46 NY2d 401, 408). In any event the majority does not ground its decision on these or other propositions of tort law, but rather on what it perceives to be policy reasons which dictate that Karén Enright’s claim should be dismissed.
The matrix of social policy and legal precedent on which Karen Enright founds her claim has been constructed by the Legislature and our Court. In 1986, the Legislature passed the Governor’s Program Toxic Torts bill and adopted a "discovery” Statute of Limitations (CPLR 214-c) for the express purpose of remedying the injustice of denying any right to relief to persons suffering from the latent effects of injuries from DES and other substances (L 1986, ch 682). In signing the Toxic Torts bill into law, the Governor noted that "this measure * * * remedies a fundamental injustice in the laws of our State which has deprived persons suffering from exposure to toxic or harmful substances from having an opportunity to present their case in court[,]” that "[t]his measure remedies the injustices suffered by all of the currently known categories of victims of exposure * * * including] persons who have suffered serious injuries as a result of exposure to diethylstilbestrol (DES)” and that "this legislation culminates a multiyear effort by these victims to achieve this long overdue reform in our law. It is a victory for justice, and an example *391 of democracy in action” (Governor’s Mem of approval, 1986 McKinney’s Session Laws of NY, at 3182-3184).
In Hymowitz v Lilly & Co. (73 NY2d 487, supra), this Court recognized the unique characteristics of DES[1] and gave practical effect to the intent of the Legislature’s important and much-heralded reform. In a precedent which created a means for a victim of DES to recover notwithstanding her inability to identify the manufacturer, the Hymowitz Court stressed that the "insidious nature” of DES injuries, the expectations created by the Legislature and the "dictates of justice and fairness” justified the remedy. The Court wrote:
"Indeed, it would be inconsistent with the reasonable expectations of a modern society to say to these plaintiffs that because of the insidious nature of an injury that long remains dormant, and because so many manufacturers, each behind a curtain, contributed to the devastation, the cost of injury should be borne by the innocent and not the wrongdoers. This is particularly so where the Legislature consciously created these expectations by reviving hundreds of DES cases. Consequently, the ever-evolving dictates of justice and fairness, which are the heart of our common-law system, require formation of a remedy for injuries caused by DES (see, Woods v Lancet, 303 NY 349, 355; see, also, *392 Kaye, The Human Dimension in Appellate Judging: A Brief Reflection on a Timeless Concern, 73 Cornell L Rev 1004).” (Id., at 507 [emphasis added].)
The majority, nonetheless, gives CPLR 214-c a narrow reading as support for its refusal to recognize Karen Enright’s claim, suggesting that "[i]mplicit in [its] language is the notion that some contact with the substance is essential” (majority opn, at 385). Nothing in the statute’s legislative history nor in its wording leads to this construction. Indeed, "exposure” under the statute "means direct or indirect exposure by absorption, contact, ingestion, inhalation or injection” (CPLR 214-c [1] [emphasis added]). As the Commentary notes, the new discovery rule applies "when the plaintiff has been the victim of exposure to a toxic substance, the critical term 'exposure’ is broadly defined” (McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C214-c:l, at 631 [emphasis added]). Given the broad language in the statute and the legislative history, the majority’s unduly constricted reading of the statute is inconsistent with the fundamental notion that remedial statutes are to be liberally construed to effectuate their aims and to promote justice (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 321).
In Codling v Paglia (32 NY2d 330, supra), the seminal case in which we adopted strict products liability in this State, we summarized the reasons in social policy, in the economic realities of mass production and distribution and in the considerations of "justice and common sense” for the rule that manufacturers which place defective products in the stream of commerce should bear the financial burdens of their harmful consequences — rather than the innocent persons who suffer the harm (id., at 340-342; Restatement [Second] of Torts § 402A, comment c). These general policies underlying strict products liability as well as the special policies pertaining to DES recognized by the Legislature in adopting CPLR 214-c and implemented by our Court in Hymowitz apply no less to Karen Enright’s claim than to the claims of other DES victims. What, then, are the policy reasons seen by the majority as compelling today’s decision? There appear to be three. None is availing.
First, the majority cites defendants’ arguments concerning the "staggering implications” and "rippling effects” (majority opn, at 386, 387) that a decision upholding Karen Enright’s claim *393 might have. But this sort of "floodgates of litigation” alarum seems singularly unpersuasive in view of our Court’s repeated admonitions that it is not "a ground for denying a cause of action that there will be a proliferation of claims” and "if a cognizable wrong has been committed that there must be a remedy, whatever the burden of the courts.” (Tobin v Gross-man, 24 NY2d 609, 615 [emphasis added]; see, Bovsun v Sanperi, 61 NY2d 219, 231; Battalla v State of New York, 10 NY2d 237, 240-242.) Beyond that, however, when defendants’ arguments are applied here to urge that although claims of DES daughters should be allowed the claims of granddaughters should not be, their forebodings strike a peculiarly ironic note: i.e., the very fact of the "insidious nature” of DES which may make the defendants liable for injuries to a future generation is advanced as the reason why they should not be liable for injuries to that generation. Should we be saying to these defendants and other companies which manufacture drugs "you must be careful to produce reasonably 'safe’ drugs and to warn of the risks of taking such drugs but in deciding whether a drug is 'safe’ you may completely ignore the havoc a particular drug may wreck on a future generation?” I think not.
Second, the majority suggests that permitting a cause of action for Karen Enright could result in "overdeterrence — the possibility that research will be discouraged or beneficial drugs withheld from the market.” (Majority opn, at 388.) But in deciding whether a particular claim for injuries from DES should be sustained, the deterrence factor is inconsequential. The wrongful conduct of the drug companies in producing and marketing DES and similarly harmful products for use by pregnant women stopped more than a generation ago when the enormity of the damage from DES became known. The sole question now involves the remedy for this past wrong, not deterrence: i.e., whether the remedy for DES victims made possible by the Legislature in CPLR 214-c and given effect by our Court in Hymowitz should be withheld from a granddaughter who suffers injuries from this wrong. But even if deterrence is assumed to be a relevant issue, should we be any less concerned with deterring the development of unsafe drugs which may cause latent damage to the third generation than to the second? Again, I think not.
Finally, in what has the ring of an economic cost-benefit analysis, the majority suggests that its generational line-drawing is proper because the manufacturers’ exposure to liability *394 is "commensurate with the risk created.” (Majority opn, at 387.) The argument is seen at once to be at odds with the rule that on this motion to dismiss Karen Enright’s complaint (CPLR 3211 [a] [7]) the court must accept as true her allegations that she is a member of the class of persons to whom the risk of injury was foreseeable (see, Becker v Schwartz, supra, at 408). But, in any event, the statement that liability should stop at Karen’s mother’s generation because it "is commensurate with the risk” is not a statement of an argument or of a legal or policy reason for a particular result. Rather, it is simply a statement of the Court’s own policy determination as to where the risk — and, hence, the liability — stops. If, as the majority apparently believes, there are economic and social considerations which require that there be some arbitrary cutoff point in cases of this kind, such a statute of repose could easily be engrafted on the Toxic Torts legislation which revived the long-outlawed dormant injury claims for DES and other substances (see, CPLR 214-c; see generally, Comment, Preconception Torts: Foreseeing the Unconceived, 48 U Colo L Rev 621; Phillips, An Analysis of Proposed Reform of Products Liability Statutes of Limitations, 56 NC L Rev 663; Note, Statutes of Limitations and the Discovery Rule in Latent Injury Claims: An Exception or the Law?, 43 U Pitt L Rev 501, 520-523). Suffice it to say, our Legislature has not chosen to cut off the claims of injured persons in Karen Enright’s generation.
II
As the primary support for its decision, the majority refers to Albala v City of New York (54 NY2d 269), a negligence case involving a single act of medical malpractice. One point must be emphasized. The decision in Albala poses no legal bar to recovery for a preconception tort and the case cannot be cited for that purpose. The Albala Court denied recovery for a preconception tort under the circumstances in that case solely on policy grounds, not for any legal or metaphysical reason arising from the fact that the injury occurred before the plaintiff was conceived. Indeed, the Albala opinion leaves little doubt that, in a proper case, there would be no legal impediment to a cause of action based on a preconception injury.[2] In distinguishing Jorgensen v Meade Johnson Labs. *395 (483 F2d 237 [10th Cir 1973]) the Court in Albala highlighted the significant difference between a malpractice case and one “for which there is strict liability without fault.” (Id., at 274, n.) The Court explained:
“Under a products liability theory, once a defect in manufacture or design is established or there has been a failure to give adequate notice of foreseeable potential hazards, the liability of the manufacturer is extended to the entire class of persons thereby affected regardless of privity, foreseeability or due care (Codling v Paglia, 32 NY2d 330). Accordingly, the necessity of establishing manageable bounds for liability is conspicuously absent. Since Jorgensen was not therefore concerned with the policy issues presented in the instant appeal, any reliance thereon is misplaced (see, also, Robertson, Toward Rational Boundaries of Tort Liability for Injury to the Unborn: Prenatal Injuries, Preconception Injuries and Wrongful Life, 1978 Duke LJ 1401, 1436, 1438).” ad., at 274, n [emphasis added].)
Thus, as the Albala opinion makes clear (id., at 274, n), the single act of malpractice in that case did not involve the compelling social and economic policies which prompted our adoption of strict products liability (see, e.g., Codling v Paglia, supra, at 338-342; Prosser and Keeton, op. cit., § 98; infra, at 392). More importantly, Albala implicated none of the deeply felt special concerns for the victims of the widespread marketing of DES which influenced the enactment of CPLR 214-c (see, Governor’s Mem of approval, op. cit., at 3182-3184; Besser v Squibb & Sons, 146 AD2d 107, 114).
In addition to what would seem to be the decisive policy differences between a malpractice action and a strict products liability action based on toxic tort, there is one significant factor impelling the Court’s decision in Albala that has no bearing here — “the undesirable impact of encouraging the practice of 'defensive medicine’.” (Albala v City of New York, 54 NY2d 269, 274, supra.) The action in Albala was for the consequences of an improperly performed abortion. In denying recovery for injuries to a subsequently conceived child, the Court stressed:
*396 "A physician faced with the alternative of saving a patient’s life by administering a treatment involving the possibility of adverse consequences to later conceived offspring of that patient would, if exposed to liability of the magnitude considered in this case, undoubtedly be inclined to advise against the treatment rather than risk the possibility of having to recompense a child born with a handicap. Accordingly, society as a whole would bear the cost of our placing physicians in a direct conflict between their moral duty to patients and the proposed legal duty to those hypothetical future generations outside the immediate zone of danger. ” (Id., at 274 [emphasis added].)
Karen Enright’s case, of course, does not involve the doctor-patient relationship and does not concern questions pertaining to the standard of knowledge, ability and care required of physicians. No "undesirable impact” of encouraging defensive medicine can result from a case of strict products liability based on the marketing of an unsafe drug where — as the Albala Court, itself, noted — "once * * * there has been a failure to give adequate notice of foreseeable potential hazards, the liability of the manufacturer is extended to the entire class of persons thereby affected regardless of privity, foreseeability or due care (Codling v Paglia, 32 NY2d 330).” (Albala v City of New York, supra, at 274, n [emphasis added].)
Moreover, this case presents none of the difficult moral dilemmas or problems of medical ethics (referred to in Albala) which can confront a physician called upon to render medical treatment to a mother which may possibly. impair her offspring. The sole question here is whether Karen Enright, an innocent member of the class of persons adversely affected by DES, should be permitted to recover. None of the policy considerations in Albala suggests that she should not be.
Ill
I am convinced that existing legal doctrine and established policy point unequivocally to a decision upholding Karen Enright’s cause of action. Let us assume for the sake of argument, however, that this is not so and that the appeal presents a "hard case” where there are no clearly discernible legal or policy guidelines. On this assumption, is there any underlying principled reason in fairness, justice or moral doctrine why Karen Enright’s claim should be turned away? *397 (See, Dworkin, Taking Rights Seriously, ch 4, "Hard Cases”, at 81-130 [1978]; Murphy and Coleman, Philosophy of Law, at 52-59 [1984].) No such reason can be advanced because none exists. There are two fundamental principles of justice, however, which dictate that Karen Enright should be permitted to prove her case.
First, Karen Enright is a victim of what — if the allegations of her complaint are proven — amounts to a wrong of enormous proportions which inflicted grievous injuries on her and countless other innocent persons. Unless her case is barred on some legal or policy ground, she should be justly compensated for her injuries to the extent that our judicial system can accomplish this. Second, she is damaged no less than other victims of DES who make up the class. If they are permitted to recover, so should she be. To say that Karen Enright cannot recover is to abrogate one of the most basic of all principles — that "like cases should be treated alike”.
Our established strict products liability jurisprudence mandated by considerations of "justice and common sense” (see, e.g., Hymowitz v Lilly & Co., supra; Codling v Paglia, supra), the compelling social policies prompting the adoption of the Toxic Torts bill (CPLR 214-c), decisions in other jurisdictions allowing recovery for preconception torts and the legal commentary all call for a decision permitting Karen Enright to prove her claim (see, Jorgensen v Meade Johnson Labs., 483 F2d 237, supra; Renslow v Mennonite Hosp., 67 Ill 2d 348, 367 NE2d 1250; Prosser and Keeton, op. cit, § 55, at 367-370; Robertson, Toward Rational Boundaries of Tort Liability for Injury to the Unborn: Prenatal Injuries, Preconception Injuries and Wrongful Life, 1978 Duke LJ 1401, 1435-1439; Collins, An Overview and Analysis: Prenatal Torts, Preconception Torts, Wrongful Life, Wrongful Death and Wrongful Birth: Time for a New Framework, 22 J Fam L 677; Comment, Preconception Torts: Foreseeing the Unconceived, 48 U Colo L Rev 621). Yet the majority denies her this right. This decision, I submit, amounts to an exercise in discretion and line-drawing reflecting social and economic policy choices which should be made not by Judges but by legislators. I dissent.
Judges Simons, Kaye, Alexander and Titone concur with Chief Judge Wachtler; Judge Hancock, Jr., dissents in part and votes to affirm in a separate opinion; Judge Bellacosa taking no part.
Order modified, etc.

. The Court in Hymowitz in devising its national market-share formulation emphasized that its action was prompted by the unusual nature of the problems caused by DES, in these words:
"We stress, however, that the DES situation is a singular case, with manufacturers acting in a parallel manner to produce an identical, genetically marketed product, which, causes injury many years later, and which has evoked a legislative response reviving previously barred actions. Given this unusual scenario, it is more appropriate that the loss be borne by those that produced the drug for use during pregnancy, rather than by those who were injured by the use, even where the precise manufacturer of the drug cannot be identified in a particular action.” (73 NY2d 487, 508 [emphasis added].)
The majority suggests (majority opn, at 385) that DES strict products cases are not special and should be treated no differently from other tort cases such as malpractice. Such suggestion is clearly at odds with the above-quoted passage from Hymowitz and with the record of special concern for DES victims shown by the Legislature (see, e.g., Governor’s Mem of approval, July 30,1986,1986 McKinney’s Session Laws of NY, at 3182) and by our Court in Hymowitz.

. To be sure, as the majority points out (majority opn, at 388), both this case and Albala are "different from other negligence cases” in that in both the plaintiffs "were injured as a consequence of injuries to the reproductive *395 systems of their mothers.” But this difference is of no consequence (see, infra, at 394-396).