OPINION OF THE COURT
Joan B. Lobis, J.
Various manufacturers of silicone breast implants and manufacturers of the silicone gel used in the implants (the defendants) have brought the present motion pursuant to CPLR 3211 (a) and (f) to dismiss a series of claims contained in the master complaint. Plaintiffs cross-moved to amend the master complaint. At oral argument, the parties were notified that the motion to dismiss would be treated as one for summary judgment and were given time to submit additional documentation. A decision was dictated into the record granting several branches of the motion and cross motion unaffected by the conversion to summary judgment. What remains to be decided are the portions of defendants’ motion seeking to dismiss plaintiffs’ cause of action for negligence based on a market share liability theory and the cause of action based on a concert of action liability theory. For the reasons stated herein, the relief is granted.[1]
Silicone breast implants are mammary prostheses that have been marketed since the early 1960’s. They are used to replace or augment breast tissue. It is plaintiffs’ contention that the implants have caused a variety of physical ailments to the women who had the devices implanted in their bodies. Pursuant to a case management order, plaintiffs were authorized to utilize a master complaint. The master complaint contains a cause of action based on a market share liability theory and a cause of action based on a concert of action liability theory. *87 Market share liability creates several liability; concert of action liability creates joint and several liability. Proof of an individual manufacturer’s responsibility for injuries is replaced by proof of participation in the marketing of a fungible product (market share) or joint action to commit a tort (concert of action). These liability theories are departures from well-settled tort law. As a result, the courts have been hesitant to utilize these theories of liability except in extremely limited circumstances.
Market share liability entered the legal lexicon as the result of litigation over the product diethylstilbestrol (DES), a synthetic form of estrogen. In the landmark case of Sindell v Abbott Labs. (26 Cal 3d 588, 607 P2d 924 [1980]), the California Supreme Court approved the use of market share liability after weighing various alternative liability theories. The trial court in Sindell had dismissed plaintiffs claims because of her inability to identify the manufacturer of the DES ingested by her mother. In approving market share liability, the Supreme Court reviewed the development of tort law expanding the ability of plaintiffs to recover for damages without proof of the identity of the responsible defendant where more than one defendant engaged in identical conduct and could have caused the harm. The court concluded that "as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury.” (Supra, 26 Cal 3d, at 610-611, 607 P2d, at 936.) The court reasoned that causation could be satisfied by apportioning liability among the defendants who placed the product in the marketplace in the same ratio as their share in the market. A defendant could escape liability if it could show it did not make the product which caused the injuries. The court determined that such a result was just since "each manufacturer’s liability would approximate its responsibility for the injuries caused by its own products.” (Supra, 26 Cal 3d, at 613, 607 P2d, at 937.)
In New York, the Court of Appeals first examined market share liability in the DES context in Hymowitz v Eli Lilly & Co. (73 NY2d 487 [1989]). Recognizing that it was establishing rules in the context of a mass litigation, the Court held that a market share theory using a national market should be applied in the DES cases because identification of the product that caused the injury to a plaintiff was impossible. The Court emphasized that identification of the manufacturers was generally impossible because of the identical chemical composition of the product, druggists filled prescriptions from whatever *88 they had in stock, a large number of companies marketed the drug and the fact that there was a lengthy latency period before the onset of disease. When adopting the market share liability, the Court said: "We stress, however, that the DES situation is a singular case, with manufacturers acting in a parallel manner to produce an identical, generically marketed product, which causes injury many years later, and which has evoked a legislative response reviving previously barred actions. Given this unusual scenario, it is more appropriate that the loss be borne by those that produced the drug for use during pregnancy, rather than by those who were injured by the use, even where the precise manufacturer of the drug cannot be identified in a particular action.” (73 NY2d, at 508.)
To determine if there is a basis to expand market share liability to silicone breast implant litigation, it is helpful to review the development of market share liability. Outside the DES context, market share liability has been sparingly adopted.[2] Its application has been largely rejected by the courts primarily on the ground that the product in question was not fungible.[3]
After DES, the most frequently considered application of the market share theory is with respect to asbestos products. Many *89 courts have rejected market share liability for asbestos products on the ground that the products are not fungible.[4] Unlike DES, asbestos is not a generic product made from one formula.[5] Asbestos is manufactured from many different fibrous minerals, mined in different locations. Each of these minerals has a different toxicity.[6] In addition, asbestos is used in many different products in many different percentages. As product design and product use varies, allowing more fibers or fewer fibers to become airborne when the product is used, the risk of harm of these asbestos products varies, reducing fungibility.[7]
This court finds that market share liability should not be applied to breast implants because such products are not fungible and the manufacturers of the implants can often be identified. There are differences in the design and composition of the implants; the warning inserts in each of the products vary; and the products are not generically marketed. Most importantly, the majority of women involved in the breast implant litigation have been able to identify all or some of the manufacturers of their implants. This ability to identify most of the manufacturers is important since both market share and concert of action liability theories came into play so plaintiffs could have recourse to the courts where product *90 identification was impossible. The rationale of the Court of Appeals decision in Hymowitz (supra) was that market share liability was necessary because the DES was an identical genetically marketed product, as a result of which the manufacturers of the product could not be identified.
In the present case, silicone breast implant manufacturers make identifiable products, marketed under specific manufacturer names. The reality of a plaintiff’s plight when product identification cannot be made is like any other plaintiff who claims injury from a product that has been lost or destroyed. So drastic a departure from traditional tort law is not warranted here. Based on the foregoing, this court holds that plaintiffs’ claim for market share liability is dismissed.[8]
Turning to defendants’ argument that no concert of action cause of action has been shown, plaintiffs assert that they have a claim under a concert of action theory based on acts taken by defendants in marketing the product and making statements to governmental agencies. They argue that all manufacturers relied on early silicone research by Dow Chemical, marketed their product without adequate testing and concealed or misrepresented known risks. Plaintiffs also claim that defendants met to formulate implantation standards and to formulate responses to the Food and Drug Administration (FDA)[9] and a House of Representatives subcommittee investigating the implants.
The Court of Appeals defined concert of action in the case of Rastelli v Goodyear Tire & Rubber Co. (79 NY2d 289 [1992]). In Rastelli, plaintiff failed to submit evidence regarding Goodyear’s manufacturing of a tire rim which allegedly caused plaintiff’s injury. The concerted action claim asserted by plaintiff’s attorney was that Goodyear engaged in concerted action with other manufacturers to " 'perpetuate the use of the *91 deadly multi-piece rims, to prevent Government implementation of appropriate safety standards and to prevent a recall.’ ” (Supra, at 296.) In evaluating these claims, the Court of Appeals held: "The theory of concerted action 'provides for joint and several liability on the part of all defendants having an understanding, express or tacit, to participate in "a common plan or design to commit a tortious act.” ’ * * * It is essential that each defendant charged with acting in concert have acted tortiously and that one of the defendants committed an act in pursuance of the agreement which constitutes a tort * * * Parallel activity among companies developing and marketing the same product, without more, we have held, 'is insufficient to establish the agreement element necessary to maintain a concerted action claim’ * * *
"[Ijnferring agreement from the common occurrence of parallel activity alone would improperly expand the concept of concerted action beyond a rational or fair limit * * * [B]ecause application of concerted action renders each manufacturer jointly liable for damages stemming from any defective product of an entire industry, parallel activity by manufacturers is not sufficient justification for making one manufacturer responsible for the liability caused by a product of another manufacturer.” (Supra, at 295-296 [citations omitted].)
The conduct upon which plaintiffs rely to establish a concert of action claim — parallel activity by the various defendants — is exactly the type of activity which the Court of Appeals held did not give rise to a concert of action theory of liability. (See, Rastelli v Goodyear Tire & Rubber Co., supra.) There has been no showing that there was an agreement, express or tacit, to commit a tortious act and there has been no proof of any act taken in furtherance of the agreement. Therefore, plaintiffs’ claim based on a concert of action theory is dismissed.
Defendants’ reliance on Bichler v Eli Lilly & Co. (55 NY2d 571 [1982]) is misplaced. In Bichler, the Court of Appeals upheld a jury instruction in a DES case which allowed a jury to find concert of action from "[consciously parallel conduct.” (Supra, at 584.) The use of concert of action theory in DES cases was ultimately rejected in Hymowitz (73 NY2d 487, supra). The Court of Appeals stated: "Now given the opportunity to assess the merits of this theory, we decline to adopt it as the law of this State. Parallel behavior, the major justification for visiting liability caused by the product of one manufacturer upon the head of another under this analysis, is *92 a common occurrence in industry generally. We believe, therefore, that inferring agreement from the fact of parallel activity alone improperly expands the concept of concerted action beyond a rational or fair limit” (supra, at 508). Similarly, the decision in City of New York v Lead Indus. Assn. (190 AD2d 173 [1st Dept 1993]) is of no guidance since it fails to describe the conduct the Court relied upon to conclude that a claim against the trade association was legally sufficient.

. Although the majority of cases pending in New York have been removed to Federal court in conjunction with Dow Coming’s filing for chapter 11 relief in Bankruptcy Court, a number of cases remain in State court. This court still has jurisdiction to render a decision on the issues presented which were fully submitted prior to the removal.

. It has been adopted for litigation involving tainted blood products — ■ Factor VIII — which was a source of HIV infections. (See, Doe v Cutter Biological, 971 F2d 375 [9th Cir 1992]; Smith v Cutter Biological, 72 Haw 416, 823 P2d 717 [1991].) Intermediate appeals courts have also approved its use for cases involving asbestos-lined brake pads in California (Wheeler v RaybestosManhattan, 8 Cal App 4th 1152, 11 Cal Rptr 2d 109 [1st Dist 1992]; Richie v BridgestoneI Firestone, Inc., 22 Cal App 4th 335, 27 Cal Rptr 2d 418 [1st Dist 1994]) and lead paint manufacturers in Ohio (Jackson v Glidden Co., 98 Ohio App 3d 100, 647 NE2d 879 [1994]).

. See, e.g., Miller v Wyeth Labs., 43 F3d 1483, No. 94-6090, 1994 WL 708197 (10th Cir 1994) (unpublished disposition) (vaccine); Lee v Baxter Health Care Corp., 898 F2d 146 (4th Cir 1990); White v Celotex Corp., 907 F2d 104 (9th Cir 1990) (asbestos); Robertson v Allied Signal, 914 F2d 360 (3d Cir 1990) (asbestos in tire plant); Setliff v du Pont de Nemours & Co., 32 Cal App 4th 1525, 38 Cal Rptr 2d 763 (3d Dist 1995) (paints, solvents, strippers, glue products); Becker v Baron Bros., 138 NJ 145, 649 A2d 613 (1994) (asbestos brake shoes); York v Lunkes, 189 111 App 3d 689, 545 NE2d 478 (1989) (batteries); Shackil v Lederle Labs., 116 NJ 155, 561 A2d 511 (1989) (vaccine); Bixler v Avondale Mills, 405 NW2d 428 (Minn Ct App 1987) (flannel); Case v Fibreboard Corp., 743 P2d 1062 (Okla 1987) (asbestos); Celotex Corp. v Copeland, 471 So 2d 533 (Fla 1985) (asbestos).
One court rejected its applicability to silicone breast implants holding, inter alia, that Maryland law required product identification. (Lee v Baxter Health Care Corp., 898 F2d 146 [4th Cir 1990], supra.)

. See, Robertson v Allied Signal, 914 F2d 360 (3d Cir 1990), supra; White v Celotex Corp., 907 F2d 104 (9th Cir 1990); Mullen v Armstrong World Indus., 200 Cal App 3d 250, 246 Cal Rptr 32 (1st Dist 1988); Gard v Raymark Indus., 185 Cal App 3d 583, 229 Cal Rptr 861 (2d Dist 1986); Celotex Corp. v Copeland, 471 So 2d 533 (Fla 1985), supra; Leng v Celotex Corp., 196 Ill App 3d 647, 554 NE2d 468 (1990); Becker v Baron Bros., 138 NJ 145, 649 A2d 613 (1994), supra; Sholtis v American Cyanamid Co., 238 NJ Super 8, 568 A2d 1196 (1989); Goldman v Johns-Manville Sales Corp., 33 Ohio St 3d 40, 514 NE2d 691 (1987).

. See, Mullen v Armstrong World Indus., 200 Cal App 3d, at 255, 246 Cal Rptr, at 35, supra; Celotex Corp. v Copeland, 471 So 2d, supra, at 537; Leng v Celotex Corp., 196 Ill App 3d, at 650, 554 NE2d, at 470, supra; Goldman v Johns-Manville Sales Corp., 33 Ohio St 3d, at 51, 514 NE2d, at 701, supra.

. See, Robertson v Allied Sand, 914 F2d, at 379, supra; Mullen v Armstrong World Indus., 200 Cal App 3d, at 255, 246 Cal Rptr, at 35, supra; Leng v Celotex Corp., 196 Ill App 3d, at 650, 554 NE2d, at 470, supra; Becker v Baron Bros., 138 NJ, at 162, 649 A2d, at 621, supra; Sholtis v American Cyanamid Co., 568 A2d, at 23, 568 A2d, at 1204, supra.

. See, Mullen v Armstrong World Indus., 200 Cal App 3d, at 255, 246 Cal Rptr, at 35, supra; Gard v Raymark Indus., 185 Cal App 3d 583 (order not published), 229 Cal Rptr 861, 868 (2d Dist 1986) (ordered not published), supra; Celotex Corp. v Copeland, 471 So 2d, at 537, supra; Leng v Celotex Corp., 196 Ill App 3d, at 650-651, 554 NE2d, at 470-471, supra; Goldman v Johns-Manville Sales Corp., 33 Ohio St 3d, at 51, 514 NE2d, at 701, supra; Case v Fibreboard Corp., 743 P2d 1062, 1066 (Okla 1987), supra.

. It is not clear that plaintiffs who cannot identify an implant are without remedies. If some but not all of the implants can be identified, the plaintiffs’ cause of action can proceed. In addition, circumstantial evidence may be available to establish product identity for some plaintiffs. It may also be possible to identify products through what is known about the hospitals’ stocking of implants or a given surgeon’s predilection for one type of implant over other implants.

. In 1976 Congress passed the Medical Devices Amendment to the Food, Drug and Cosmetics Act. The implants were not required to provide proof of their safety since they were already on the market. They were reclassified as class III medical devices in 1988. This change required manufacturers to submit to the rigors of premarket approval for a product that had been on the market for over 20 years. The change of classification came about after the FDA received numerous complaints about the devices.