[699 NYS2d 848]

RICHARD K. BRENNER et al., as Parents and Natural Guardians of RICHARD BRENNER, III, an Infant, Respondents, et al., Plaintiff, v AMERICAN CYANAMID COMPANY, as Successor in Interest to MACGREGOR LEAD COMPANY, et al., Appellants, et al., Defendants.

Fourth Department, December 30, 1999

## APPEARANCES OF COUNSEL

*Michael T. Nilan,* Minneapolis, Minnesota, for SCM Corporation, appellant.

*Philip H. Curtis,* New York City, for American Cyanamid Company and others, appellants.

*Paul M. Pohl,* Pittsburgh, Pennsylvania, for Sherwin Williams Company, appellant.

*Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, L. L. P.,* Buffalo (*Philip H. Magner* of counsel), for Richard K. Brenner and others, respondents.

*James A. Henderson, Jr.,* Ithaca, for Chemical Manufacturers Assn., *amicus curiae.*

*Pepper Hamilton, L. L. P.,* New York City (*Kathleen Kaczor* of counsel), for Product Liability Advisory Council, *amicus curiae.*

## OPINION OF THE COURT

HAYES, J.

### I

The issue presented in this appeal is whether a market share theory for determining liability and apportioning damages (*see, Hymowitz v Eli Lilly & Co.,* 73 NY2d 487, *cert denied* 493 US 944) should apply in a lead poisoning case in which the identification of the manufacturer of lead pigment whose product allegedly caused the lead poisoning cannot be ascertained. We conclude that the theory should not be applied.

### II

Richard K. Brenner and Terry L. Brenner (plaintiffs) commenced this action as parents and natural guardians of their child, Richard Brenner, III (Richard), alleging that he became ill after ingesting lead-based paint chips and inhaling dust from deterioration of lead-based paint applied to the walls of

their residence. In January 1992, when Richard was less than two years old, plaintiffs moved into an apartment in a house that was built in 1926. By September 1992 Richard was diagnosed with severe lead poisoning as confirmed by blood tests and the presence of "lead lines" on radiographs of the child's long bones. Richard's sister and mother recalled seeing Richard placing his mouth on the window sills and placing paint chips in his mouth. The Erie County Department of Health conducted a lead investigation of plaintiffs' apartment. Out of the 43 sites that were examined, 15 tested positive for lead.

In the complaint, plaintiffs alleged that Richard sustained permanent injuries to his central nervous system that were proximately caused by his ingestion of the paint chips and dust containing white lead pigments, including dry white lead carbonate, dry white lead sulfate, and dry white lead in oil. A neurobehavioral-cognitive assessment of Richard in 1998 revealed that, although he had average academic skills, "he evidenced deficits in impulse control, attention, concentration, abstract thinking, comprehension, visual organization and graphomotor skills, speech articulation, [and] dysgraphia coupled to an attention deficit-hyperactivity disorder". Plaintiffs' medical expert opined that those deficits were caused by early and severe lead poisoning.

Plaintiffs named as defendants manufacturers or successors in interest to manufacturers of white lead carbonate during the period from 1926, the year the house in which plaintiffs resided was built, until 1955, the year lead-based paint was no longer sold for interior residential use. Plaintiffs also sued defendant Lead Industries Association, Inc., a trade association that included as members the manufacturer defendants. Plaintiffs alleged various causes of action, including negligence and strict products liability. Plaintiffs alleged that the presence of white lead carbonate in interior residential paint rendered the paint defective and dangerous. However, plaintiffs alleged that they were unable to identify the manufacturer of the white lead carbonate found in their residence, and thus also asserted three theories of collective liability: enterprise liability, market share liability, and alternative liability. All of the defendants, with the exception of SCM Chemicals, Inc. and Eagle-Picher Industries, Inc., moved for partial summary judgment dismissing the sixth, seventh, and eighth causes of action of the amended complaint, which alleged those three theories of collective liability, against them. Supreme Court granted in

part the motions of those defendants (hereafter defendants) and dismissed the sixth and eighth causes of action, which allege enterprise liability and alternative liability. The court denied those parts of defendants' motions with respect to the seventh cause of action, which alleges market share liability. For the reasons that follow, we conclude that the court should have granted defendants' motions in their entirety.

## III

Plaintiffs contend that the market share theory, first adopted by the Court of Appeals in *Hymowitz,* should apply to this case. We agree with defendants that the market share theory should not be extended to this case.

In *Hymowitz,* the plaintiffs were daughters of women who had ingested the drug diethylstilbestrol (DES) during pregnancy (*Hymowitz v Eli Lilly & Co., supra,* at 502). Tests indicated that, as a result of their mothers' ingestion of DES, plaintiffs developed vaginal adenocarcinoma, a form of cancer, and adenosis, a precancerous vaginal or cervical growth (*Hymowitz v Eli Lilly & Co., supra,* at 502-503). Each plaintiff was unable to identify the manufacturer of the DES pill ingested by her mother because all DES manufactured had an identical chemical composition and pharmacists "usually filled prescriptions from whatever was on hand" (*Hymowitz v Eli Lilly & Co., supra,* at 503). In addition, approximately 300 manufacturers produced the drug, and companies entered and left the market during the 24 years that the drug was sold for pregnancy use (*Hymowitz v Eli Lilly & Co., supra,* at 503). The long latency period of a DES injury compounded the identification problem (*Hymowitz v Eli Lilly & Co., supra,* at 503).

The Court noted that, "[i]n a products liability action, identification of the exact defendant whose product injured the plaintiff is, of course, generally required" (*Hymowitz v Eli Lilly & Co., supra,* at 504). Rather than dismissing the action on the ground that the plaintiffs were unable to identify which defendant manufactured the product that injured them, the Court adopted a market share theory using a national market whereby liability was apportioned "so as to correspond to the over-all culpability of each defendant, measured by the amount of risk of injury each defendant created to the public-at-large" (*Hymowitz v Eli Lilly & Co., supra,* at 512; *see, Matter of DES Mkt. Share Litig.,* 79 NY2d 299, 303). Instead of requiring each plaintiff to identify the manufacturer that produced the drug ingested by her mother, the Court required each plaintiff to

identify only the nine-month period during which her mother ingested the drug, the manufacturers in the market during that period, and the respective share of each such manufacturer during that period (*see, Hymowitz v Eli Lilly & Co., supra,* at 511-512; *see also, Matter of DES Mkt. Share Litig., supra,* at 307).

Liability was apportioned among the DES manufacturers in that manner "to correspond to the over-all culpability of each defendant, measured by the amount of risk of injury each defendant created to the public-at-large" (*Hymowitz v Eli Lilly & Co., supra,* at 512). Thus, the basis of liability was the culpability of a DES manufacturer for marketing the drug, and not causation in a single case (*Hymowitz v Eli Lilly & Co., supra,* at 512). The Court noted that, "[u]nder the circumstances, this is an equitable way to provide plaintiffs with the relief they deserve, while also rationally distributing the responsibility for plaintiffs' injuries among defendants" (*Hymowitz v Eli Lilly & Co., supra,* at 512).

The Court in *Hymowitz* recognized, however, that the market share theory was a remedy for a unique situation: "We stress, however, that the DES situation is a singular case, with manufacturers acting in a parallel manner to produce an identical, generically marketed product, which causes injury many years later, and which has evoked a legislative response reviving previously barred actions. Given this unusual scenario, it is more appropriate that the loss be borne by those that produced the drug for use during pregnancy, rather than by those who were injured by the use, even where the precise manufacturer of the drug cannot be identified in a particular action" (*Hymowitz v Eli Lilly & Co., supra,* at 508).

### IV

The issue whether the market share theory applies in lead poisoning cases is one of first impression in New York. Those courts in other jurisdictions in which this issue has arisen have refused to apply the market share theory to lead poisoning cases (*see, Jefferson v Lead Indus. Assn.,* 930 F Supp 241, 246-247, *affd* 106 F3d 1245; *Santiago v Sherwin Williams Co.,* 3 F3d 546, 550-551; *City of Philadelphia v Lead Indus. Assn.,* 994 F2d 112, 123-127; *Hurt v Philadelphia Hous. Auth.,* 806 F Supp 515, 534-536; *Skipworth v Lead Indus. Assn.,* 547 Pa 224, 230-234, 690 A2d 169, 171-173). We agree with those courts and conclude, for the reasons that follow, that this case, involving injuries allegedly caused by lead pigment, is not amenable to recovery based on a market share theory.

We note that New York courts have refused to extend the market share theory beyond cases involving DES (*see, Matter of New York State Silicone Breast Implant Litig.,* 166 Misc 2d 85, 89, *affd* 234 AD2d 28 [not applicable to breast implants]; *DaSilva v American Tobacco Co.,* 175 Misc 2d 424, 427 [not applicable to cigarettes]). Courts in other jurisdictions have also declined to extend the market share theory outside the DES context (*see, e.g., McClelland v Goodyear Tire & Rubber Co.,* 735 F Supp 172, 174-175, *affd* 929 F2d 693 [toxic chemicals]; *White v Celotex Corp.,* 907 F2d 104, 106 [asbestos]; *Lee v Baxter Healthcare Corp.,* 721 F Supp 89, 93-94, *affd* 898 F2d 146 [breast prosthesis]; *Bateman v Johns-Manville Sales Corp.,* 781 F2d 1132, 1133-1134 [asbestos]; *Thompson v Johns-Manville Sales Corp.,* 714 F2d 581, 583, *cert denied* 465 US 1102 [asbestos]; *Bly v Tri-Continental Indus.,* 663 A2d 1232, 1241-1245 [DC] [benzene]; *Shackil v Lederle Labs.,* 116 NJ 155, 190-191, 561 A2d 511, 529 [DPT vaccine]; *Gaulding v Celotex Corp.,* 772 SW2d 66, 70-71 [Tex] [asbestos]; *Goldman v Johns-Manville Sales Corp.,* 33 Ohio St 3d 40, 48-52, 514 NE2d 691, 699-702 [asbestos]; *Case v Fibreboard Corp.,* 743 P2d 1062, 1067 [Okla] [asbestos]). Under some circumstances, however, market share liability may provide an appropriate remedy for those plaintiffs who cannot, for various reasons, identify the defendant who manufactured the particular product that allegedly caused harm. It is apparent, however, that market share liability is indeed a seldom used exception to the general rule in products liability actions that a plaintiff "must establish by competent proof * * * that it was the defendant who manufactured and placed in the stream of commerce the injury-causing defective product" (*Healey v Firestone Tire & Rubber Co.,* 87 NY2d 596, 601).

## V

Upon our comparison of the factors present in this case to those present in *Hymowitz,* we conclude that the market share theory is not appropriate here. Plaintiffs in this case, like the plaintiffs in *Hymowitz,* are unable to identify the manufacturer of the product that allegedly caused the injury. Plaintiffs know that, from 1926 when the house was built, until 1955, when lead-based paint for interior residential use was no longer available for sale, the interior of the house was painted one or more times with paint that likely contained white lead carbonate. Plaintiffs, who moved into the subject apartment in 1992, are unable to ascertain when the house was painted, what

brand of paint was used, or which defendant manufactured the white lead carbonate that was used in the paint.

Plaintiffs urge this Court to apply the market share theory to this case so that their child, and others similarly situated, have a remedy against manufacturers who produced and marketed the toxic pigment. However, the only factor present in both this case and *Hymowitz* is the inability of the plaintiffs to identify which defendant manufactured the injury-causing product, and thus we conclude that the exceptional remedy of market share liability should not apply here.

One of the factors considered by the Court in *Hymowitz* was the ability of the plaintiffs to define an appropriate national market. In the DES context, the national market was the approximately 300 known manufacturers of DES (*see, Hymowitz v Eli Lilly & Co., supra,* at 503). In lead poisoning cases, a national market is not as easily defined. Defendants here manufactured white lead carbonate, but there were lead compounds other than white lead carbonate found in the paint in plaintiffs' apartment, including leaded zinc oxide, lead chromate, lead silicate, and lead sulfate. Plaintiffs' own expert agreed that white lead carbonate accounts for only approximately 80% of the lead in all lead pigments used for interior paints between 1926 and 1955. The remaining 20% of the lead pigments found in interior paints may have been manufactured by defendants not named in this litigation.

In addition, the Court in *Hymowitz* narrowed the national market to include only those manufacturers of DES who marketed the drug for pregnancy use (*see, Hymowitz v Eli Lilly & Co., supra,* at 512). The Court stated that to impose liability on a manufacturer who did not market DES for pregnancy use "would be unfair and unjust" (*Hymowitz v Eli Lilly & Co., supra,* at 512). Plaintiffs allege that interior residential white lead paint was unreasonably dangerous, but they have not narrowed the national market to include only those manufacturers of white lead carbonate that sold the product for interior residential use. In addition to interior residential paint, white lead carbonate was used for products such as exterior residential paint and nonresidential paint, uses that are not alleged to be harmful. Plaintiffs have not produced evidence of any single defendant's share of the relevant market for interior residential paint use. Thus, plaintiffs attempt to hold defendants liable for manufacturing white lead carbonate, regardless of how the product was used. Applying market share liability in the context of this case would result in liability disproportionate to the risk created.

A second factor considered by the Court in *Hymowitz* was the plaintiffs' ability to identify a narrow time period in which to apply the market share theory. The DES plaintiffs knew when their mothers ingested the drug and thus when the product was sold. In contrast, plaintiffs in this case assert that they are unable to identify the particular year or years in which paint was applied to the interior of the house. The time period identified is between 1926, the year the house was built, and 1955, the year lead-based paint was no longer available for interior residential use. During that extended time period, some of the defendants entered and left the white lead carbonate market. Even if plaintiffs could determine each defendant's average market share during those 29 years, the application of such percentages would result in the possibility of assessing liability against a manufacturer that was not in the market at the time the lead-based paint was used in plaintiffs' residence.

A third factor considered by the Court in *Hymowitz* was that DES was "an identical, generically marketed product" (*Hymowitz v Eli Lilly & Co., supra,* at 508). All DES manufactured had an identical chemical composition. In contrast, lead-based paint is not a fungible product; it contains varying amounts of lead pigments, including white lead carbonate. Arguably, the white lead carbonate used as a raw material in some lead-based paint did not differ between manufacturers. However, paint manufacturers used differing amounts of white lead carbonate, or some other lead pigment, in their paints. Some lead-based paint contained 10% lead pigment, while other paint was more toxic, containing as much as 50% lead pigment. Not only did the amount of lead pigment vary, but so did the type of lead pigment used. Thus, unlike DES, the finished product that was used by consumers here, i.e., lead-based paint, was not fungible.

A fourth factor considered by the Court in *Hymowitz* was the exclusive control of DES manufacturers over any risk produced by their product. There was no change in the drug from the point of manufacture to the point of ingestion by the patient. In contrast, the manufacturers of white lead carbonate did not have exclusive control of the risk. The paint manufacturers, rather than the lead pigment manufacturers, decided which pigments to use and in what quantities. In addition, owners and landlords of residences had control of some of the risk posed by lead-based paint, which becomes hazardous when it peels and flakes and is then ingested or the dust inhaled. Owners and landlords could control such risk by proper mainte-

nance of their property. Furthermore, manufacturers of DES intended that their product be ingested by pregnant women to prevent miscarriages. In contrast, white lead carbonate or lead-based paint is not intended for ingestion and obviously was not marketed for such a use.

Another factor present in the DES context was that the plaintiffs in *Hymowitz* had signature injuries—vaginal adenocarcinoma and adenosis—that were linked to DES (*see, Hymowitz v Eli Lilly & Co., supra*, at 502-503). There is no such signature injury in lead poisoning cases. Plaintiffs allege that Richard sustained injuries to his central nervous system, including difficulties with concentration, abstract thinking, and comprehension. But Richard's injuries could have been caused by some source other than lead, or even by a source of lead other than lead-based paint. An additional factor present in *Hymowitz* was a signal by the Legislature that there should be a remedy for DES plaintiffs. The Legislature had revived for one year actions for injuries caused by DES that were previously barred by the Statute of Limitations, thus indicating that there should be a remedy for the problem of identifying defendants (*see, Hymowitz v Eli Lilly & Co., supra*, at 502, 504, 508). There has been no such legislative signal in the context of lead pigment manufacturers.

The inability to identify a narrow time period in which to apply the market share theory, the absence of a fungible product, and the absence of a signature injury are among the reasons that other courts have refused to apply the market share theory in lead poisoning cases (*see, Jefferson v Lead Indus. Assn.,* 930 F Supp 241, 246-247, *affd* 106 F3d 1245, *supra*; *Santiago v Sherwin Williams Co.,* 3 F3d 546, 550-551, *supra*; *City of Phildelphia v Lead Indus. Assn.,* 994 F2d 112, 123-127, *supra*; *Hurt v Philadelphia Hous. Auth.,* 806 F Supp 515, 534-536, *supra*; *Skipworth v Lead Indus. Assn.,* 547 Pa 224, 230-234, 690 A2d 169, 171-173, *supra*). We agree with that reasoning.

## VI

In sum, we conclude that the application of the market share theory is inappropriate here because lead pigments other than white lead carbonate are used in lead-based paint; white lead carbonate is used for products other than interior residential paint; plaintiffs assert that they cannot determine when the lead-based paint was applied to their apartment; lead pigments are found in products other than lead-based paint; lead-based paint is not fungible; the manufacturers of white lead carbon-

ate were not in exclusive control of the risk posed by lead-based paint; there is no signature injury associated with lead poisoning; and there is no indication by the Legislature that there should be a remedy for lead poisoning plaintiffs.

Accordingly, the order should be modified by granting defendants' motions for partial summary judgment in their entirety and dismissing the seventh cause of action of the amended complaint against defendants.

LAWTON, J. P., HAYES, HURLBUTT and BALIO, JJ., concur.

Order unanimously modified, on the law, and as modified, affirmed, without costs, in accordance with the opinion by HAYES, J.