OPINION OF THE COURT
Emily Pines, J.
Defendants, The Dow Chemical Company (Dow), sued in this case as a manufacturer of perchloroethylene (perc or PCE), and R.R. Street & Co. (Street), sued as an exclusive distributor of perc and as a manufacturer of a perc-containing product, move to dismiss the plaintiff Suffolk County Water Authority’s (SCWA) complaint, as amended, pursuant to CPLR 3211 (a) (7) or for alternative relief under CPLR 3211 (c). The SCWA opposes the motion.
The basis for the current motion lies in the admitted inability of the SCWA to identify each precise defendant whose allegedly defective product injured the plaintiff and how the conduct of such party was the “cause-in-fact” of such injury. In its now *571 amended complaint, the Suffolk County Water Authority asserts what is known as “market share liability” with regard to the chemical manufacturing defendants in this case based upon, inter alia, the plaintiff’s assertion that identification of the exact defendant whose product caused the environmental property damage alleged is impossible.
Defendants contend that the use of the market share collective liability concept has been approved in only one instance in the State of New York — in the case of Hymowitz v Eli Lilly & Co. (73 NY2d 487 [1989]). As set forth by Dow and Street, the Court of Appeals in Hymowitz permitted the use of market share liability in a unique instance where injured plaintiffs were unable to prove which manufacturer of DES actually made the product taken by their mothers and allowed several liability to be imposed on all market participants according to the share each contributed to DES sold for use during pregnancy. However, these defendants assert that such was not the only basis for the unique holding in Hymowitz. Rather, they state that the Court of Appeals cautioned: “[t]he DES situation is a singular case, with manufacturers acting in a parallel manner to produce an identical, generically marketed product, which causes injury many years later, and which has evoked a legislative response reviving previously barred actions.” (Hymowitz at 508.) Moreover, defendants assert that in Hymowitz, the manufacturers only contributed to the risk involved as the pill itself was the only causative agent, and no issues of fact were presented to the court in that case regarding product misuse by patients, physicians or pharmacists. In a later case, the Court of Appeals, therefore, as per the defendants, rejected use of the market share approach in Hamilton v Beretta U.S.A. Corp. (96 NY2d 222 [2001]). The Court denied application of the approach in that case brought by shooting victims against handgun manufacturers stating that
“[e]ach manufacturer engaged in different marketing activities that allegedly contributed to the illegal handgun market in different ways and to a different extent. Plaintiffs made no attempt to establish the relative fault of each manufacturer, but instead sought to hold them all liable based simply on market share. . . .
“Defendants engaged in widely-varied conduct creating varied risks. Thus, a manufacturer’s share of the national handgun market does not necessar *572 ily correspond to the amount of risk created by its alleged tortious conduct. No case has applied the market share theory ... to such varied conduct and wisely so.” (Hamilton at 241.)
Thus, the defendants argue that the SCWA’s claims in its amended complaint are not limited to manufacture and sale of PCE to dry cleaners, but, also include allegations of improper marketing and negligent failure to provide appropriate instructions and warnings regarding the use of perc as well as its disposal — actions which are not uniform in the manner of manufacture of DES. Moreover, defendants state that plaintiff has now asserted liability by these manufacturers, which have sold and marketed their product to differing industries, opening the issue of differences among the various means and methods by which perc contamination could occur.
According to defendants, the most significant distinction between this case and Hymowitz lies in the fact that it is undisputed that control of risk of perc contamination extends well beyond any conduct of manufacturers to include: (1) independent distributors responsible for dissemination of product literature and safe delivery of the chemical; (2) manufacturers of dry cleaning machines designed to use perc products; (3) property owners who exercise control over activities on their property; (4) dry cleaners who operate the equipment and dispose of PCE; and (5) myriad other users of PCE such as industrial facilities and individual homeowners who use it to clean septic tanks. The defendants cite Brenner v American Cyanamid Co. (263 AD2d 165 [4th Dept 1999]), where the Court rejected the market share approach in a case against manufacturers of lead pigment used in paints. The Court, in Brenner, as per defendants herein, distinguished causation of harm from lead paint where the control of risk was shared among the pigment manufacturers and paint manufacturers, as well as owners and landlords of residential properties, who controlled risk through maintenance practices:
“A fourth factor considered by the Court in Hymowitz was the exclusive control of DES manufacturers over any risk produced by their product. . . . [0]wners and landlords of residences had control of some of the risk posed by lead-based paint, which becomes hazardous when it peels and flakes and is then ingested or the dust inhaled. Owners and landlords could control such risk by proper maintenance of their property. Furthermore, manufactur *573 ers of DES intended that their product be ingested by pregnant women to prevent miscarriages. In contrast, white lead carbonate or lead-based paint is not intended for ingestion and obviously was not marketed for such a use.” (.Brenner at 172-173.)
Thus, as per the holding in Brenner, defendants assert that this court is indeed bound to reject the market share approach by SCWA.
Defendants point to more areas distinguishing the current case from Hymowitz. These include the assertion that market sales of perc cannot be apportioned as with DES by identifying uniform conduct over a discrete period of time, as the SCWA has failed to identify when the contamination occurred. In addition, there has been no legislative signal to provide a tort remedy as there was in the DES situation. Further, defendants assert that as in Hamilton, the SCWA’s claims against PCE manufacturers are not limited to the simple manufacture of goods, but also include negligent failure to provide appropriate warnings regarding the use of the chemical.
Finally, the moving defendants argue that even if the court were inclined to apply the market share approach in this case, the SCWA has failed to establish the very first condition precedent — i.e., that following exhaustive discovery, conventional proof of product identification is impossible. In this regard, defendants note that the plaintiff has failed to notice the depositions of many dry cleaners or distributors nor conducted interviews of the same. In this vein, the defendants set forth that even if discovery at this stage would lead to no evidence of manufacturer identification, that the SCWA failed to investigate and track down sources of contamination (including dry cleaners, distributors and manufacturers) for decades since its 1980 annual report following a presentation to the Suffolk County Legislature concerning PCE contamination in the groundwater and its 1994 article by a SCWA engineer identifying dry cleaners as one of the sources of PCE contamination.
Plaintiff, SCWA, opposes the motion, setting forth that the Court of Appeals in the Hymowitz and Hamilton decisions never stated that market share liability was to be limited solely to cases involving DES. Rather, plaintiff asserts that where the identification of the manufacturer of a defective product is generally impossible, a plaintiff need not identify the particular defendant that caused the injury. However, in such cases, the plaintiff must still make a prima facie case on all other ele *574 ments of the alleged tort. Even in Hamilton, which rejected application of the market share approach to liability, according to plaintiff, the Court of Appeals did not state that it was so holding based upon the fact that handguns were not DES. Rather, as per SCWA, the Court conducted a factual analysis and determined that market share could not apply because:
“[ujnlike DES, guns are not identical, fungible products. Significantly, it is often possible to identify the caliber and manufacturer of the handgun that caused injury to a particular plaintiff. Even more importantly — given the negligent marketing theory on which plaintiffs tried this case — plaintiffs have never asserted that the manufacturers’ marketing techniques were uniform.” (Hamilton at 240-241.)
In the case at bar, SCWA argues that PCE remains a fungible product, is entirely interchangeable, and the defendants, through extensive discovery, have themselves not identified any means to distinguish the product within a dry cleaning machine, released to the aquifer and traveling through the soil. Plaintiff also sets forth that the number of chemical manufacturers is small and all of the same have been named in plaintiffs original complaint.
SCWA also distinguishes this case from Hamilton because its claim is one of defective design. It states that its allegation is essentially that perc was defective the moment it left the manufacturer’s control, and that it did not become dangerous only through the acts of third parties, such as is the case with the handguns. Rather, perc is assertedly defective as designed and cannot be used in any manner without its release into the environment. Moreover, according to plaintiff, the chemical defendants were well aware of the release of perc during normal use and handling by distributors and dry cleaners. The plaintiff supports this assertion by submission of one of its experts, Bruce Dale, who states dry cleaning was designed with the expectation that PCE-containing waste would be disposed of through the drain and that all knew this.
In further support of this claim, plaintiff asserts that whether warnings varied, as claimed by defendants, is irrelevant to the question whether the product itself varied among the chemical defendants — plaintiff has asserted that the product itself was defectively designed; that it is fungible, interchangeable and generic.
In addition, the plaintiff distinguishes its claims from those set forth in Brenner. It asserts that in Brenner, the plaintiffs *575 sued the manufacturers of lead carbonate alleging that their house was painted with paint containing such product; however, the existence of other lead compounds and their presence in some but not all lead paints led the Fourth Department to conclude that, unlike DES, lead paint is not a fungible product that remained unchanged from manufacture to ingestion. (Brenner at 172.) The plaintiff in the case at bar has stated that PCE did not change from the point of manufacture and sale to the point of injury — here, the contamination of one of the SCWA wells. Moreover, although Brenner also refers to the risk of harm by contributing third parties, plaintiff argues that there has been no showing by defendants that any nonparty herein contributed to the risk of harm presented by the design itself of perc.
Plaintiff submits admissions by chemical defendants obtained during the course of discovery, in which they stated that PCE is generic and fungible. As set forth in the deposition of an employee of Street responsible for the company’s nationwide solvent business between 1974 and 2011: “[d]ry cleaners typically didn’t know what perc they were using. They may know who they purchased it from in terms of the distributor they purchased it from, but they wouldn’t know whose product it was.”
Plaintiff referred to additional testimony of defendants to the effect that when one manufacturer’s PCE was introduced into the dry cleaner’s system, it would be commingled with a product produced by another manufacturer, rendering identification basically impossible. The fact that one manufacturer’s PCE is interchangeable with that of another manufacturer was also assertedly admitted in the interrogatory responses of chemical manufacturer defendant, Legacy Vulcan Corporation. This was assertedly reiterated by discovery from dry cleaners. Again, plaintiffs expert opined that “[i]t is impossible to distinguish between perc made by one manufacturer versus perc made by another manufacturer.”
SCWA argues that other factors contribute to why a sufficient claim has been made in the case at bar for a market share approach to avoid dismissal under CPLR 3211 (a). These include the assertion of a long latency period, citing the opinion of plaintiffs hydrologist that PCE moves at a pace of one to two feet per day through the aquifer underlying Suffolk County. Plaintiff also points to what it terms exhaustive discovery resulting in an inability to determine which defendants’ products *576 caused the harm asserted herein. Thus, out of 88 subpoenas served on dry cleaners in Suffolk County, only one was able to identify the manufacturing source of its perc; serial owners as well as poor document retention preclude in many instances the ability to obtain documentary evidence pertaining to operations at locations in the 1980s and 1990s; at some locations, there have been as many as four establishments. Plaintiff has also assertedly attempted to obtain information by serving subpoenas on 24 distributors, some of whom have ceased doing business, some of whom have refused to reply, some of whom have stated they have no records, and others that have verbally spoken with one of plaintiffs experts stating that they have no documents reflecting sales or deliveries of PCE to dry cleaners in Suffolk County. Further, of the actual depositions SCWA has taken of dry cleaning operators, they were essentially unable to identify the manufacturers of the PCE and those that had invoices from distributors produced documents which again lacked any manufacturer identification. Thus, the plaintiff sets forth that it has conducted exhaustive discovery and such contradicts the defendants’ claim that it can somehow discover what it has not been able to uncover thus far. Plaintiff also avers that its expert estimates that 75-80% of all PCE releases to the environment come from dry cleaning; that the chemical defendants named in this case produced all the PCE found in Suffolk County and indeed represent over 90% of the market for PCE in the United States.
Finally, the plaintiff argues that the assertion by defendants that other parties may have contributed to PCE contamination of the Suffolk County wells does not prevent the defendants from demonstrating to the trier of fact that other causes contributed to such property damage nor that such party’s conduct constitutes either an intervening or superseding cause cutting the causal connection with regard to a particular well. In this vein, plaintiff argues that under New York law, if an intervening act was a foreseeable consequence of the defendant’s negligence, that defendant will still be held liable.
Defendants assert, in reply, that plaintiffs description of its own allegedly extensive discovery only adds support to their current motion. Thus, they set forth that the Water Authority’s description of the “Carillon Cleaners” site problem demonstrates that contributors to the harm included the dry cleaner operator, the PCE distributor, the manufacturer of dry cleaning equipment and those responsible for site cleanup — all in addi *577 tion to the chemical manufacturers. Thus, defendants argue that the PCE case cannot be based upon a theory of market share where it simply cannot accurately apportion all fault that contributed to the risk.
Defendants also opine that the plaintiff cannot escape the relevance of differences among the PCE manufacturer’s various product warnings simply by dropping its failure to warn cause of action. It claims, rather, that this supports its theory that to allocate fault, the contents of various warnings must be determined.
Defendants set forth that the Brenner case has been recently followed by S.F. v Archer-Daniels-Midland Co. (2014 WL 1600414, 2014 US Dist LEXIS 55195 [WD NY, Apr. 21, 2014, No. 13-CV-634S]), where the court rejected the market share doctrine to a product liability claim against manufacturers of high fructose corn syrup, stating, inter alia, that defendant manufacturers did “not have exclusive control of the risk” associated with the product. (2014 WL 1600414, *6, 2014 US Dist LEXIS 55195, *17.) In this vein, defendants point to the opinions from the SCWA’s experts demonstrating that diy cleaning equipment manufacturers and suppliers contribute to the risk of PCE contamination, and from Suffolk County inspectors setting forth that dry cleaning establishment owners dumped waste down the floor drain because they didn’t want to pay for proper removal.
Based on the above, defendants ask this court to dismiss the complaint in toto, as the plaintiff has clearly asserted that it cannot identify which chemical company produced the precise PCE in any of the subject contaminated wells. In the alternative, defendants ask this court to dismiss so much of the first amended complaint as to SCWA’s market share theory.
Motion to Dismiss
When faced with a motion to dismiss a complaint pursuant to CPLR 3211 (a) (7) for failure to state a cause of action, the court is required to afford the pleading a liberal construction, accept each and every fact as asserted in the pleading to be true, accord the plaintiff the benefit of every possible inference, and determine only whether the facts as alleged fit within any cognizable legal theory. (Rietschel v Maimonides Med. Ctr., 83 AD3d 810 [2d Dept 2011]; Hallman v Kantor, 72 AD3d 895 [2d Dept 2010]; Breytman v Olinville Realty, LLC, 54 AD3d 703 [2d Dept 2008].) In assessing a motion under CPLR 3211 (a) (7), a *578 court is free to consider affidavits submitted to aid in support of allowing the complaint to stand (Leon v Martinez, 84 NY2d 83 [1994]; Endless Ocean, LLC v Twomey, Latham, Shea, Kelley, Dubin & Quartararo, 113 AD3d 587 [2d Dept 2014]).
Market Share
Whenever the issue of market share liability comes before a New York court involving a different product, it essentially becomes a case of first impression. As defendants have aptly stated, the theory of recovery has been sanctioned in only one instance by the Court of Appeals in Hymowitz v Eli Lilly & Co. (73 NY2d 487 [1989]). In that case, claims based on market share liability were allowed to proceed in a litigation stemming from injuries caused by DES, a drug administered to pregnant women and later found to cause birth defects, in a situation where plaintiffs were unable, after many years had passed since the marketing of the drug and the appearance of the injuries, to identify the precise company that had manufactured the product giving rise thereto. (Hymowitz at 502.) In identifying the bases for its holding, the Hymowitz court set forth that victims of DES needed a “realistic avenue of relief for plaintiffs injured by DES . . . who [could not] identify the actual manufacturer.” (Id. at 507, 520.) However, the Court made clear that this approach would be limited to those instances where manufacturers of a defective product produced an “identical, generically marketed product, which causes injury many years later” (id. at 508). In addition, the liability of the DES manufacturers was held to be “several” only, to be determined according to each producer’s share of the national market. (Id. at 512-513.)
Following Hymowitz, the United States District Court for the Eastern District of New York found that plaintiffs exposed to Agent Orange were unable to identify the specific manufacturers of the herbicide, a defective generic product which caused harm at a later date, making it impossible to identify the individual tortfeasor. (In re Agent Orange Prod. Liab. Litig., 597 F Supp 740 [ED NY 1984], affd 818 F2d 145 [2d Cir 1987].) In the Agent Orange litigation, as in Hymowitz, the state legislature had revived actions based upon exposure to the product after such had been previously barred by the statute of limitations. (See CPLR 214-c.) Judge Scheindlin permitted the market share liability approach to survive a motion to dismiss in a case involving alleged contamination of groundwater with gasoline additive methyl tertiary butyl ether (MTBE), although the doctrine was *579 ultimately not applied in that case. (In re Methyl Tertiary Butyl Ether [‘MTBE”] Prods. Liab. Litig., 447 F Supp 2d 289 [SD NY 2006].) In denying the motion to dismiss the plaintiffs’ claim the court noted that “[u]nder market share liability, the burden of identification shifts to defendants if plaintiff establishes a prima facie case on every element of the claim except for identification of the actual tortfeasor or tortfeasors, and plaintiff has joined manufacturers representing a ‘substantial share’ of the relevant market.” (Id. at 299.)
Since Hymowitz, the courts have been reluctant to apply market share liability in a series of other cases involving product liability and other tort claims. Thus, where the Court of Appeals rejected application of the approach in Hamilton v Beretta US.A. Corp. (96 NY2d 222 [2001]), it stressed that handguns were not identical, fungible items; that the plaintiffs could often identify the manufacturer that caused a particular injury; and because the case was based upon negligent marketing, the plaintiff had not even alleged that such were uniform amongst the defendants therein. (Hamilton at 240-241.)
In Brenner v American Cyanamid Co. (263 AD2d 165 [4th Dept 1999]), the Fourth Department looked at all the reasons why market share liability was applied in Hymowitz, and, finding none of them in a case involving injury arising from ingestion of lead-based paint pigment, rejected its use. First, the Court noted that, in Hymowitz, the plaintiffs defined a national market of DES manufacturers, not easily defined in lead poisoning cases, and that the Hymowitz plaintiffs narrowed to manufacturers who sold DES solely for pregnancy. The Fourth Department found, however, that “[p]laintiffs allege that interior residential white lead paint was unreasonably dangerous, but they have not narrowed the national market to include only those manufacturers of white lead carbonate that sold the product for interior residential use.” (Id. at 171.) Second, while the Hymowitz plaintiffs were able to define the time period in which to apply the market share liability by identifying when the plaintiffs’ mothers ingested DES, the same was not true of the Brenner plaintiffs. (Id. at 172.) Third, lead-based paint, unlike DES, was not an “identical, generically marketed product.” (Id.) Fourth, the Brenner court found that the DES manufacturers exercised exclusive control over their product from the point of manufacture to the point of ingestion; whereas:
“the manufacturers of white lead carbonate did not have exclusive control of the risk. The paint manu *580 facturers, rather than the lead pigment manufacturers, decided which pigment to use and in what quantities. In addition, owners and landlords of residences had control over some of the risk posed by lead-based paint, which becomes hazardous when it peels and flakes and is then ingested or the dust inhaled.” (Id.)
Fifth, the Fourth Department noted that the “signature” nature of DES related injuries was not present in the context of injuries arising from exposure to lead-based paint. (Id. at 173.)
In S.F. v Archer-Daniels-Midland Co. (2014 WL 1600414, 2014 US Dist LEXIS 55195 [WD NY, Apr. 21, 2014, No. 13-CV-634S]), the United States District Court for the Western District of New York found that New York’s market share theory would not apply to a product liability claim against manufacturers of high fructose corn syrup because the court found no “ ‘signature injury’ definitively linking the product to the harm”; there was no claim that the injuries were far removed from ingestion of the product; the defendant manufacturers did not “have exclusive control of the risk”; and there existed no legislation suggesting an overriding public interest in allowing those particular claims to proceed. (2014 WL 1600414, *6, 2014 US Dist LEXIS 55195, *17.)
In examining the manufacturer defendants’ motion to dismiss the SCWA’s amended complaint, the court has examined all of the above cases to attempt to resolve the issue of whether or not adoption of a market share theory through use of a national market can be sustained in the case of harm caused by the manufacturers of perchloroethylene. The key case, in the court’s view, is Hymowitz v Eli Lilly & Co. After all is said and done, Chief Judge Wachtler stressed that judicial action was necessitated in the DES arena in order to overcome the “inordinately difficult problems of proof” caused by generically marketed products which were defective from their inception, where the harm caused by the same did not occur until substantial time had passed since ingestion. (Hymowitz at 507.) Under such circumstances, the Court found that equity required that where the injury remained dormant for such a long period and where manufacturers contributed to the devastation, the “ever-evolving dictates of justice and fairness, which are the heart of our common-law system, require [d] formation of a remedy for injuries caused by [the defective product].” (Id.)
In the case of perc, taking as true the allegations set forth by plaintiff in its amended complaint along with the accompanying *581 experts’ affidavits, the SCWA has set forth that perchloroethylene is defective from the moment of its manufacture; that it is a generic and fungible product; and that it takes many years from the point of its “ingestion” through seepage into the ground until it appears in one of the water purveyor’s wells, causing extensive environmental harm, in the form of serious property damage. The allegations continue with excerpts from defendants’ witnesses to the effect that the fungible product of one manufacturer of perc becomes commingled with that of another over time and that it is essentially impossible to locate which manufacturer contributed to what extent to the contamination of which particular Water Authority well. In addition, the plaintiff herein has asserted that without application of the market share theory for determining liability, it, like the DES plaintiffs, will be left without remedy for the harm assertedly caused by the chemical manufacturers herein. Plaintiff has further alleged that the product was not only dangerous from the point of manufacture, but, also, that it was reasonably foreseeable that it would cause harm to the groundwater system wherever it was ultimately used. It has assertedly named the entire chemical manufacturing market for the relevant time period and states that its experts are able to track the time periods from product use to resultant property damage.
Based upon the above, especially in the context of a motion brought pursuant to CPLR 3211 (a) (7),[1] the court believes that plaintiff has set forth a proper claim for relief and that such is not dismissible as a matter of law. The court, in so holding, does not ignore the cautionary language set forth in Hymowitz, but, rather, looks to the fact that what appear to be the major reasons for its holding are present in this matter. In contrast, those very same elements are found not to be present in Hamilton v Beretta U.S.A. Corp. nor in Brenner v American Cyanamid Co. As stated by plaintiff herein, the Court of Appeals in Hamilton found the very bases for market share set forth in Hymowitz to be absent, i.e., handguns are not identical fungible products and the manufacturers of the same are possible to identify. (.Hamilton at 240-241.) In addition, the assertion in the current complaint is that the product was defective the very moment it left the manufacturers’ control and did not become dangerous, *582 as in the case of handguns, only through the use of third parties.[2] Similarly, in Brenner, there was again a finding that lead paint is not a fungible product remaining unchanged from manufacture to ingestion, it was not a generically marketed product, the identical nature of the injuries alleged were absent, and the plaintiffs had not narrowed a national market to include only manufacturers that sold the product for interior use — the area from which the harm assertedly rose. (.Brenner at 171-173.) In S.F. v Archer-Daniels-Midland Co., the court found again no signature injuiy nor a long period from the time of ingestion to the time of injuiy (2014 WL 1600414, *6, 2014 US Dist LEXIS 55195, *17).
This court, of course, recognizes that Brenner distinguishes the lead-based paint from DES for the additional reason that other parties contributed to the harm, an issue which does exist in the case at bar. However, it is this court’s opinion that this case is distinguishable from Brenner because lead-based paint was found not to involve a generically marketed fungible product, the plaintiffs therein failed to identify the necessary market of manufacturers of interior lead paint, and the complaint did not contain a claim, as herein, that the manufacture itself was dangerous resulting in serious harm. For the foregoing reasons, this court finds both Brenner and Hamilton distinguishable from this case.
The court notes that although it is denying a motion to dismiss a pleading, this does not absolve the plaintiff from the requirements of ultimately sustaining its burden of proving the dangerous nature of the product at the time of its manufacture and sale, the forseeability of harm caused from the point of manufacture, and the damage proximately caused therefrom. In addition, as discussed in conference with counsel for the parties involved, this court will grant the request made on behalf of the chemical manufacturers that if it allows the complaint to proceed as amended, they will be entitled to additional discovery relevant to the new allegations made therein.
However, the court does not agree that if it is found that the product as designed was dangerous and that such danger arose from the point of manufacture, in conjunction with fungibility *583 and the impossibility of designating chemical defendants, all of whom are set forth in this action, as well as a lengthy latency period, that plaintiff cannot utilize the market share theory in this case. Accordingly, defendants’ motion to dismiss the SCWA’s amended complaint is denied.

. The court does not find that the alternative relief sought by defendants under CPLR 3211 (c) is appropriate, since the factual assertions raised by the defendants merely underscore that at this stage the parties have set forth hotly disputed issues of fact.

. This decision addresses the causes of action set forth in the amended complaint with the exception of the cause of action for failure to warn. The court finds the papers submitted somewhat unclear as to whether that cause of action is withdrawn, and that matter is referred for the next scheduled conference.